IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KACEY KIMBROUGH, Special Administrator
of the Estate of Shawn Thomas Kimbrough,

Plaintiff,

vs.

CHRISTOPHER JAMES GORHAM;
JENNINGS PLANT SERVICES, LLC; and
HOPE COOPERATIVE CARE, INC.,

Defendants.

**8:21CV35**

**MEMORANDUM AND ORDER ON
BENCH TRIAL**

This case was brought by plaintiff Kacey Kimbrough as personal representative of the Estate of Shawn Thomas Kimbrough. It is before the Court after a bench trial on Kimbrough's claim for damages under the Nebraska Wrongful Death Act, Neb. Rev. Stat. § 30-809 *et seq.*, against defendant Christopher James Gorham. Filing 41. Gorham admits that he was negligent, that his negligence was the proximate cause of the accident, and that Kacey Kimbrough and Kacey and Shawn's daughter, E.K., have been damaged. Filing 101 at 3. Thus, the only issue before the Court at the bench trial was the damages suffered by Kacey and E.K. Filing 101 at 5. The Court now enters its Memorandum and Order setting out its findings of fact, conclusions of law, and damages award.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Kacey Kimbrough, the widow of decedent Shawn Thomas Kimbrough, filed her original Complaint in this action as the Special Administrator of the Estate of Shawn Thomas Kimbrough on January 1, 2021. Filing 1. For the sake of simplicity, the Court will refer to Plaintiff

1

as Kimbrough, while referring to the widow as Kacey, and referring to the decedent as Shawn. Kimbrough's operative pleading is now her June 25, 2021, Second Amended Complaint. Filing 41. In that Second Amended Complaint, Kimbrough asserted wrongful death claims pursuant to Nebraska Revised Statute §§ 30-809 and 30-810 against defendants Christopher James Gorham; Gorham's employer Jennings Plant Services, LLC, (JPS); Spencer Jennings and Tarin Jennings, the owners and managers of JPS; and Hope Cooperative Care, Inc., Shawn's employer at the time of his death. Filing 41 at 2 (¶¶ 3–6). Hope Cooperative Care and its insurance carrier paid workers compensation benefits to Shawn's dependents, and they now claim a subrogation interest in this action. Filing 41 at 2 (¶ 6). However, no substantive claim is asserted against Hope Cooperative Care. *See generally* Filing 41.

Kimbrough asserted four claims in her Second Amended Complaint. Count I asserted a wrongful death claim against Gorham based on allegations that he was negligent in the operation of his vehicle, while under the influence of alcohol, when he drove it across the center line of the highway directly into the lane in which Shawn was driving, resulting in a head-on collision and Shawn's death. Filing 41 at 3–4 (¶¶ 12–14). Count II asserted a wrongful death claim against JPS based on allegations of negligent hiring and supervision of Gorham. Filing 41 at 5–6 (¶¶ 18–19). Count III asserted negligent entrustment against Spencer and Tarin Jennings for allowing Gorham to use a company vehicle when they knew or should have known that Gorham was intoxicated or impaired and that his use of the vehicle created an unreasonable risk of harm. Filing 41 at 7 (¶ 25). Count IV asserted negligent supervision against Spencer and Tarin Jennings based on allegations they personally failed to use ordinary care and prudence in exercising the duty of care, and specifically in training and supervising Gorham. Filing 41 at 9–10 (¶ 33).

2

Eventually, the Court entered a Memorandum and Order granting the Motion to Dismiss for Failure to State a Claim by Spencer and Tarin Jennings as to Count IV of Kimbrough's Second Amended Complaint. Filing 55. In January 2023, the Court granted Kimbrough's Motion to Dismiss as to Spencer and Tarin Jennings based on Kimbrough's statement that she did not intend to pursue claims against them and intended to release such claims with prejudice. Filing 83. In February 2023, a magistrate judge of this Court entered an Order to Show Cause why judgment should not be entered against JPS for failure to obtain licensed counsel and to comply with this Court's Order to obtain counsel after JPS's counsel had been allowed to withdraw from representing JPS. Filing 91. In March 2023, the Court accepted a magistrate judge's Findings and Recommendation that default and default judgment should enter against JPS because no counsel had appeared and JPS had filed no other response to the Order to Show Cause by the deadline specified. Filing 95. Consequently, the Court directed the Clerk of Court to enter JPS's default on the record, Filing 95 at 3, and the Court thereafter entered default judgment against JPS, Filing 97. Thus, only the claims against Gorham remained for trial.

In an Amended Answer to Second Amended Complaint, Gorham admitted the following:

> 14.    Defendant Gorham admits that he was negligent and that his negligence was the proximate cause of the accident.

> 15.    Defendant Gorham admits that as a result of the accident described in Plaintiff's Second Amended Complaint, Kacey Kimbrough and [E.K.] have been damaged by the loss of support, services, comfort, and companionship that they would have enjoyed were it not for Shawn's death.

Filing 100 at 2–3 (¶¶ 14–15); *see also* Filing 101 at 3 (Order on Pretrial Conference). Thus, the only issue before the Court at the bench trial was the damages suffered by Kacey and E.K. Filing 101 at 5.

Prior to the bench trial, both parties submitted trial briefs. Filing 104; Filing 105. Kimbrough also submitted Proposed Findings of Fact, Conclusions of Law, and Judgment. Filing 106. The Court held a bench trial on August 11, 2023. Filing 98 (Trial Minutes). At the bench trial, the Court admitted Exhibits 1 through 25, and 27. Filing 108. The only exhibit offered but not admitted—Exhibit 26—was the Declaration of David Campbell, an owner of Hope Cooperative Care, Inc., and Shawn's uncle. The only witnesses to testify were Kacey Kimbrough and her damages expert, Donald Frankenfeld, both by video conference. Gorham presented no witnesses or exhibits. At the conclusion of the bench trial, the Court directed the parties to file written closing arguments. Filing 110 at 137 (Trial Tr. 137:2–20). Gorham filed his Closing Argument Brief on September 27, 2023, after obtaining a transcript of the trial. Filing 113. On October 16, 2023, Kimbrough filed her Closing Argument Brief, Filing 117, and her Proposed Findings of Fact, Conclusions of Law, and Judgment, Filing 117-1.

This matter is now deemed fully submitted.

## B. Findings on Facts Necessary for Context

In this part of this decision, the Court will set out only those uncontroverted facts submitted by the parties plus some additional findings of fact that the Court deems necessary to put in context the Court's further findings of fact on contested issues and the Court's conclusions of law. The Court will make further findings of fact in its Conclusions of Law and Additional Findings of Fact below.

### 1.    *Findings on Uncontroverted Facts*

The Court accepts the uncontroverted facts set out in the Order on Pretrial Conference, although the Court may not set out all those uncontroverted facts here. Filing 101 at 3–5. Plaintiff

Kacey Kimbrough is the widow of Shawn and a wrongful death beneficiary under Nebraska Revised Statute § 30-810. Kacey Kimbrough is the personal representative of the Estate of Shawn with legal standing to assert claims under Nebraska Revised Statute § 30-810 for Shawn's death. E.K. is the natural born daughter of Kacey and Shawn. E.K. was born March 25, 2017, and is now six years old. E.K. is Shawn's surviving next of kin and a wrongful death beneficiary under Nebraska Revised Statute § 30-810.

On October 27, 2020, at approximately 11:38 am, Shawn was driving a vehicle in a generally northbound direction on Highway 75, a two-lane road, just south of its intersection with MM 111 in Washington County, Nebraska. Defendant Christopher James Gorham was traveling southbound at that time and place driving a 2011 Ford F-150 pickup truck (the truck). Gorham drove the truck across the center line, outside of his lawful lane of travel, and directly into the lawful lane of travel of Shawn, causing a direct head-on collision (the Accident). Shawn died at the scene as a direct result of physical trauma from the Accident. In Nebraska state court criminal proceedings related to the Accident, Gorham pleaded no contest and was convicted of Motor Vehicle Homicide, a Class IIA Felony.

At the time of the Accident, Gorham was employed by Jennings Plant Services, LLC. (JPS). Gorham's job duties for JPS involved driving a vehicle to perform job-related tasks. Gorham was driving the company truck southbound on Highway 75 toward Omaha for a COVID-19 test required by JPS. Gorham had JPS's permission as a part of his employment to drive the truck to Omaha for the purpose of obtaining a COVID-19 test. Thus, at all times relevant to this case, JPS was the owner of the truck Gorham was driving for his work. At all times relevant to the Accident,

Gorham was working as an employee for JPS, he was operating a company truck, and he was acting within the course and scope of his employment with JPS.

### 2. *Findings of Fact Necessary for Context*

Shawn's estate is a citizen and resident of the State of Arkansas, and at the time of Shawn's death Shawn and Kacey were domiciled in Arkansas. Filing 41 at 1–2 (¶ 1); Filing 100 at 1 (¶ 1). Kacey is now domiciled in Missouri. Filing 41 at 1–2 (¶ 1); Filing 100 at 1 (¶ 1). JPS is a Nebraska corporation with its principal place of business in the State of Nebraska. Filing 41 at 2 (¶ 4); Filing 100 at 1 (¶ 4). Gorham is a citizen of and domiciled in Nebraska. Filing 41 at 2 (¶ 3); Filing 100 at 1 (¶ 3).

Shawn was born on October 15, 1985, so he was 35 years old at the time of his death. Filing 110 at 18:16–18. Kacey Kimbrough was born on April 22, 1987, so she was 33 years old at the time of Shawn's death. Filing 110 at 13:14–16. The Kimbroughs were married in 2010. Filing 110 at 24:22. Shawn's worklife expectancy was to the age of 64.6 years, Filing 110 at 96:13, with an alternative worklife expectancy until age 70, Filing 110 at 100:10–13. The life expectancy for both Kacey Kimbrough and E.K. substantially exceeds Shawn's worklife expectancy, whether that is calculated as 64.6 years or 70 years. Exhibit 27.

Kacey testified,

> I think [Shawn] would work the rest of his life. He just always wanted to be involved in some aspect of business, and he loved working with different things, and so I think he would have just kept working until he couldn't.

Filing 110 at 69:8–11; *see also* Filing 110 at 69:12–13 (clarifying that she meant "physically unable to work"). She also answered "yes" to counsel's questions about whether Shawn would have worked past age 65 or into his 70s, if he was physically able. Filing 110 at 69:14–24.

However, she also testified that he had some sinus issues in 2018 or 2019 that led to a surgery for a deviated septum, which did not resolve the problem, and another surgery and treatment at the Mayo Clinic. Filing 110 at 71:2–7; Filing 110 at 73:21–24 (stating that he had another surgery at the Mayo Clinic). Eventually, Shawn started feeling better toward the end of 2020 about the time of the Accident. Filing 110 at 71:8–9.

Kacey testified that the sinus issue did not keep Shawn from working or interfere in any significant or prolonged way with his life and that he did not have any medical issues that might have shortened his life expectance. Filing 110 at 71:10–19. On cross-examination, Kacey acknowledged that there had been discussions during the sinus issues about a possible autoimmune disorder, but no actual diagnosis was made at that time. Filing 110 at 73:7–14. She also acknowledged that even though Shawn's symptoms improved "drastically" after treatment at the Mayo Clinic, his symptoms would flare up from time to time, including having reactions to certain medications that he was taking. Filing 110 at 74:2–14. Kacey also acknowledged that Shawn found his sinus condition to be mentally and physically draining on him and that there were some evenings when he would just go to bed after dinner. Filing 110 at 74:15–75:1. She also acknowledged that Shawn had sought "counseling services" in Arkansas around 2014 or 2015 and that he had been diagnosed with hypothyroidism before they were married, but that "it was in remission." Filing 110 at 75:2–11. Kacey also agreed that the family's health insurance benefits were through her job not through Shawn's. Filing 110 at 75:12–18.

Kacey is an elementary school teacher. Filing 110 at 14:22–23. Shawn had a bachelor's degree in business with a concentration in finance and risk management from Virginia Commonwealth University. Filing 110 at 21:24–22:4. He also had a master's degree in business

administration from the University of Arkansas. Filing 110 at 29:19–21:14. Shawn started working in 2008 in the default asset management department of Freddie Mac. Filing 110 at 23:12–14. By 2015, however, he was working in the IT department at Wal-Mart's corporate office in Bentonville, Arkansas. Filing 110 at 29:9–13. The Kimbrough's tax return for 2015—the earliest one available in the record—shows that Shawn made $99,087 working for Wal-Mart. Exhibit 12. The tax return for 2016 shows that he made $151,119, Exhibit 13, working for Wal-Mart and then for Pilgrim's Pride where he was training to be a plant manager in Mount Pleasant, Texas. Filing 110 at 31:2–10. The tax return for 2017 shows that he made $174,872, Exhibit 14, working as a plant manager for Pilgrim's Pride in Florida. Filing 110 at 63:10–15. The tax return for 2018 shows that he made $240,460, Exhibit 15, working as a plant manager for Pilgrim's Pride in Florida. Filing 110 at 63:18–22. In 2018, Shawn moved back to Bentonville to rejoin his family and took a job with Tyson Foods in their corporate office. Filing 110 at 38:8–20. In December 2019, he took a new job with Timber Automation in Hot Springs, Arkansas, a few hours from where the Kimbroughs were living. Filing 110 at 44:6–11. Timber Automation was a smaller business where Shawn worked in a corporate office. Filing 110 at 44:13–16. The tax return for 2019 shows that he made $175,014, Exhibit 16, from working for Tyson Foods and Timber Automation. Filing 110 at 63:23–64:1.

In March 2020, the COVID-19 pandemic hit, and Shawn was let go by Timber Automation because of the pandemic shutdown. Filing 110 at 45:8–15. In the summer of 2020, Shawn began talking to his uncle about working for Hope Cooperative Care, Inc., in Nebraska, which was a business in which his uncle was a part owner. Filing 110 at 47:15–48:1. Kacey testified that Hope Cooperative Care "was a type of living facility for people with disabilities that maybe they didn't

have family to live with or anywhere else, but it provided them a safe living environment." Filing 110 at 47:11–14. Kacey's understanding was that Shawn "was going to be involved on the business side, help with financing and things like that, and eventually wanted to become a—a partner in the company," and eventually an owner. Filing 110 at 47: 22–48:1. While Kacey and E.K. remained in Arkansas, Shawn would work in Nebraska from Monday until he returned to Arkansas on Wednesday or Thursday to be with his family over the weekend. Filing 110 at 49:16–18. Kimbrough's expert testified that he was "familiar with" Shawn being paid $1,000 a week by Hope Cooperative Care, Inc., or $52,000 a year. Filing 110 at 115:10–14. The tax return for 2020 shows that Shawn made $61,980 from Timber Automation and Hope Cooperative Care, Inc. Exhibit 17.

Shawn and Kacey had joint accounts into which "the majority of [their] income would go," but each also had a personal checking account into which a percentage of their income would be deposited, and the funds could then be spent without having to discuss it because that money was already budgeted. Filing 110 at 64:8–17.[1] Kacey answered "yeah" to counsel's question about whether the money that went into the separate accounts was used to support the family, adding, "It just wasn't discussed as critically as like our joint checking." Filing 110 at 65:19–22. Kacey answered "yes" to questions about whether she and Shawn had "joint retirement and savings accounts" and whether money deposited into the joint checking account would be used to support the family. Filing 110 at 64:18–25. Kacey also testified that for the most part Shawn was "frugal"

---

[1] Kacey later answered "yes" to the question, "The—the joint and separate bank accounts that you had, for the joint account, was it approximately 80 percent of your income and his income put into the joint account?" Filing 110 at 76:16–19. It is not clear from this or any other evidence in the record whether the deposit to the joint account was 80% of each person's income or 80% of their total income, nor is it clear whether each person deposited 20% of his or her income into his or her separate account, or whether each deposited 10% of their income into each separate account. Filing 110 at 77:24–78:6.

9

and saved money and that they both "tried to be smart about the way [they] spent money." Filing 110 at 66:23–67:2.

## II. CONCLUSIONS OF LAW AND FURTHER FINDINGS OF FACT

### A. Wrongful Death Claims under Nebraska Law

Kimbrough's claims are for wrongful death. Thus, the Court's analysis begins with a discussion of wrongful death claims under Nebraska law.

*1.    The Statutory Authorization*

A wrongful death action is authorized by Neb. Rev. Stat. § 30-809. The statute states,

> Whenever the death of a person, including an unborn child in utero at any stage of gestation, is caused by the wrongful act, neglect, or default of any person, company, or corporation, and the act, neglect, or default is such as would, if death had not ensued, have entitled the person injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or company or corporation which, would have been liable if death had not ensued, is liable in an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to felony.

Neb. Rev. Stat. § 30-809(1). Indeed, "[t]he right to maintain an action for wrongful death did not exist under the common law and exists in Nebraska, as in other states, solely by statute." *Paulk v. Cent. Lab'y Assocs., P.C.*, 636 N.W.2d 170, 180 (Neb. 2001).

The Wrongful Death Act also provides,

> Every such action, as described in section 30-809, shall be commenced within two years after the death of such person. It shall be brought by and in the name of the person's personal representative for the exclusive benefit of the widow or widower and next of kin.

Neb. Rev. Stat. § 30-810; *Gonzalez v. Union Pac. R.R. Co.*, 803 N.W.2d 424, 440 (Neb. 2011) ("Only a decedent's personal representative may bring a claim for wrongful death of that decedent."). As the Nebraska Supreme Court has explained, "A wrongful death action is brought

10

on behalf of the widow or widower and next of kin for damages they have sustained as a result of the decedent's death." *In re Est. of Panec*, 864 N.W.2d 219, 225 (Neb. 2015) (contrasting a wrongful death action with a survival action). Put a slightly different way, "[a] wrongful death action permits statutorily designated survivors of the decedent to bring a cause of action to redress their injuries resulting from the decedent's death." *Id.* at 227.

The Court concludes that this wrongful death action is timely. It was commenced on January 29, 2021, which is less than two years after Shawn's death on October 27, 2020. *See* Neb. Rev. Stat. § 30-810. The Court also concludes that this wrongful death action has been properly brought by the personal representative, Kacey Kimbrough, on behalf of the designated survivors, Shawn's widow and daughter, and that it properly seeks redress for their injuries resulting from his death. Neb. Rev. Stat. § 30-810; *Panec*, 864 N.W.2d at 225, 227; *Gonzalez*, 803 N.W.2d at 440.

### 2.    *Damages for Wrongful Death*

The damages available in a wrongful death action are also established by statute: "The verdict or judgment should be for the amount of damages which the persons in whose behalf the action is brought have sustained." Neb. Rev. Stat. § 30-810. In other words, "a wrongful death action seeks damages that pertain to the personal loss of the survivors." *Panec*, 864 N.W.2d at 227. "[Section] 30–810 provides no basis upon which to recover a decedent's own damages." *Id.*

"The next of kin may recover in a wrongful death action only those losses sustained after the injured party's death by reason of being deprived of what the next of kin would have received from the injured party from the date of his or her death, had he or she lived out a full life expectancy." *Corona de Camargo v. Schon*, 776 N.W.2d 1, 8 (Neb. 2009). "Such damages include

11

the pecuniary value of the loss of the decedent's support, society, comfort, and companionship."
*Panec*, 864 N.W.2d at 225. However, such damages must be "shown by the evidence to have a
pecuniary value." *Reiser v. Coburn*, 587 N.W.2d 336, 340 (1998).

A general damages principle applicable to a wrongful death case is "that the amount of
damages to be awarded is a determination solely for the fact finder, and the fact finder's decision
will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship
to the elements of the damages proved." *Richardson v. Children's Hosp.*, 787 N.W.2d 235, 246
(Neb. 2010). The general rule against "speculative" damages is applied more flexibly in wrongful
death cases, however:

> The damages involved in a wrongful death case even today must of necessity deal
> primarily with a fictitious or speculative future life, as it might have been had the
> wrongful death not occurred. For that reason, virtually all evidence of future
> damage is necessarily speculative to a degree.

*Selders v. Armentrout*, 207 N.W.2d 686, 688 (Neb. 1973).

Damages are the disputed issue in this case.

### 3.   *Kimbrough's Damages Claims for Wrongful Death*

The parties' briefing indicates that three categories of damages are at issue in this case:
(1) funeral and burial expenses, (2) lost financial support, and (3) lost society, comfort, and
companionship. *See, e.g.*, Filing 105 at 2 (seeking funeral and burial expenses), 2–4 (seeking lost
financial support), 4 (seeking damages for lost of care, companionship, and comfort in a single
line); Filing 113 at 6 (discussing funeral and burial expenses), 12–16 (discussing lost financial
support at length), 17 (taking no position on the appropriate damages award for lost comfort and
companionship); Filing 117 at 3–11 (discussing lost financial support at length), 3 ("The evidence
further demonstrates that the value of services, comfort, and companionship provided by Shawn

(and that has been lost by his death) is even greater than the financial loss."). The Court will consider these three kinds of losses in turn.

### B.  Funeral Expenses

In Kimbrough's pre-trial Proposed Findings of Fact, Conclusions of Law, and Judgment, Kimbrough contends that "[a]s a direct result of the death of Shawn, Plaintiff has incurred funeral and burial expenses of $14,009.87 (Plaintiff's Ex. 11)." Filing 106 at 8. She asserts that the Court should find those expenses fair and reasonable. Filing 106 at 8. Gorham likewise seeks an "additional finding of fact"—beyond those to which the parties stipulated—that "[a]s a direct result of the death of Shawn, Plaintiff has incurred funeral and burial expenses of $14,009.87 (Ex. 11)." Filing 113 at 6. Thus, the Court will award $14,009.87 for funeral and burial expenses.

### C.  Lost Financial Support

The Court finds that a critical issue in its determination of lost financial support is the effect of Kimbrough's expert's opinion on this issue when the Court is the factfinder. The Court will then turn to the issue of calculating Kimbrough's lost financial support.

#### 1.    The Effect of an Expert's Testimony when the Court is the Factfinder

In her trial brief and at the bench trial, Kimbrough based her claim for lost financial support on the opinions of her expert, Mr. Frankenfeld, which began with the expert's assumption that Shawn's initial annual earning capacity at the time of his death was $207,737, the average of his last two full and highest earning years based on his tax returns. Filing 105 at 3; Filing 110 at 89:12–24. Gorham did not present an expert of his own—or indeed any witnesses at all—relying instead on his cross-examination of Kimbrough's expert. However, it was readily apparent that Gorham took issue with Mr. Frankenfeld's determination of initial earning capacity. *See, e.g.*, Filing 110 at 114:3–116:24. At the conclusion of the bench trial, the Court asked the parties to address in their

13

written closing arguments whether the Court can make an assessment and pick another number if the Court decided that the initial earnings estimate by Mr. Frankenfeld was not appropriate. Filing 110 at 138:14–21. Specifically, the Court asked what it would have to do to pick another number under the law. Filing 110 at 138:14–21. The parties did not hesitate to weigh in on the issue.

a.   The Parties' Arguments on the Effect of the Expert's Testimony

Gorham takes the position that the Court, as the trier of fact, can accept or reject any or all of Mr. Frankenfeld's opinions. Filing 113 at 8 (citing cases). He asserts that the same standard applies whether the jury or the trial court is the trier of fact. Filing 113 at 9. He goes so far as to assert that the expert's testimony is "purely advisory." Filing 113 at 9. Gorham also argues that Mr. Frankenfeld does not have any degrees in economics, finance, or accounting, he does not claim to be an expert in giving tax advice, and he has not personally received any formal training or education in making vocational assessments to determine earning capacity. Filing 113 at 11. For these reasons, Gorham asserts that the only "competent' evidence of Shawn's earning capacity at the time of his death is that he was earning $1,000 per week or $52,000 per year from Hope Cooperative Care. Filing 113 at 11.

Kimbrough asserts that an expert's opinion is not merely "advisory" but is "direct evidence." Filing 117 at 4. She also argues that Gorham's position "ignores" Federal Rule of Civil Procedure 52(a), which requires a court hearing a bench trial to base findings of fact on oral or documentary evidence to permit meaningful review. Filing 117 at 4. Indeed, she argues that when a defendant fails to put on evidence and instead simply criticizes a plaintiff's expert, the trial court should accept the plaintiff's evidence as unrebutted. Filing 117 at 5 (citing *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016 (5th Cir. 1985)). Kimbrough argues that the Court cannot simply pick

14

a number on its own that is not supported by the evidence and should instead make findings based on her expert's valid and unrebutted methodologies and evidentiary support. Filing 117 at 5. She argues, "[T]here is no evidence put forward by Gorham that would allow the Court to compute its own number, based on a makeshift averaging of the Hope Cooperative income with the earnings assumption used by expert Frankenfeld [so] [t]he Court should not simply pick a number of its own when, as here, there has been unrebutted and reliable testimony from an expert." Filing 117 at 9.

> b. Applicable Law Does Not Require the Court as Factfinder to Accept an Expert's Testimony

Kimbrough's premise that the Court must use an expert's unrebutted opinion when the Court is the trier of fact is suspect from the outset because a jury would suffer from no such constraint. A jury can accept or reject an expert's or any other witness's testimony, in whole or in part. *Russell v. Anderson*, 966 F.3d 711, 722 (8th Cir. 2020); *Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949, 954 (8th Cir. 1998) (holding that a party did not need to rebut an expert opinion on an ultimate issue because "the jury was free to accept or reject the expert testimony"). In a decision neither party cites on this issue, the Eighth Circuit Court of Appeals squarely addressed the authority of a district court to reject an expert's testimony in a bench trial. In *American Milling Company v. Trustee of the Distribution Trust*, the Eighth Circuit Court of Appeals explained,

> [T]he district court [in a bench trial] is not required to accept the opinion of either expert. "[T]he weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury," and while the judge "may not arbitrarily fail to consider such testimony, he is not bound to accept it." *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir.1977); *see Lukens v. Comm'r*, 945 F.2d 92, 96 (5th Cir.1991) (holding that a court "is not in any way bound by the opinions or formulas proffered by experts, and may reach a determination of value based upon its own evaluation of the evidence"); 7 J. Wigmore, *Evidence* § 1920, at 18–19 (J.

Chadbourn rev. 1978) (stating that an expert cannot usurp the function of the trier of fact because the trier of fact can choose to reject the expert's opinion).

*Am. Mill. Co. v. Tr. of Distribution Tr.*, 623 F.3d 570, 573–74 (8th Cir. 2010).

Other courts agree that a district court can reject expert testimony in a bench trial, in whole

or in part. As the Second Circuit Court of Appeals explained,

> Defendants further argue that it was improper for the District Court, which lacks the expertise of Hunter and Forester, to conduct its own confirmatory re-underwriting analysis. We disagree. The court conducted this analysis in its capacity as fact-finder. A fact-finder is not required to make a binary choice between adopting an expert's conclusion in full or rejecting it entirely. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (explaining that expert testimony should not "tell the jury what result to reach" but "*aid* the jury in making a decision") (emphasis in original).

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 146 (2d Cir. 2017); *Chicago Title Ins. Co. v. IMG Exeter Assocs. Ltd. P'ship*, 985 F.2d 553 (4th Cir. 1993) (explaining that in a bench trial, the district court, as the trier of fact, is free to accept or reject the expert's testimony).

Kimbrough argues that Federal Rule of Civil Procedure 52(a) somehow compels the Court to accept Mr. Frankenfeld's opinions. Filing 117 at 4. Rule 52(a) now provides in pertinent part as follows:

**(a) Findings and Conclusions.**

**(1) *In General.*** In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. . . .

**(6) *Setting Aside the Findings.*** Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

Fed. R. Civ. P. 52(a)(1), (6).[2] Kimbrough's precise argument based on Rule 52(a) eludes the Court, but it seems to be that the Court's findings must be based on evidence, so if Gorham offered no evidence, the Court must base its findings on the evidence Kimbrough produced through Mr. Frankenfeld. *See* Filing 117 at 4–5.[3] If that is indeed her argument, it is unpersuasive.

"The purpose of [Rule 52(a)] is threefold: (1) to facilitate appellate review; (2) to make the district court's decision definite for purposes of res judicata; and (3) to prompt the district court 'to fully and conscientiously consider the basis for [the] decision.'" *Boatmen's First Nat. Bank of Kansas City v. Kansas Pub. Emps. Ret. Sys.*, 57 F.3d 638, 640 (8th Cir. 1995) (quoting *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 212 n. 15 (8th Cir. 1974)); *see also Nomura Holding Am., Inc.*, 873 F.3d. at 146 n.67 (explaining that "Federal Rule of Civil Procedure 52(a) requires a

---

[2] Kimbrough quotes the pertinent parts of the rule as stating,

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon. . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous. . . .

Filing 117 at 4. Kimbrough's version of the rule is out of date. The rule now provides in pertinent part as stated in the body of this decision. Fed. R. Civ. P. 52(a)(1), (6). "These changes are intended to be stylistic only," however. *See* Fed. R. Civ. P. 52, 2007 Committee Comments. Thus, the out-of-date language Kimbrough cites is not the basis for the Court's rejection of Kimbrough's argument.

[3] Kimbrough's argument based on Rule 52(a) is as follows:

> Gorham ignores the role of Federal Rule of Civil Procedure 52(a) in the Court's deliberations. [Quotation of former version of Rule 52(a) omitted.] Courts have made it clear that Rule 52(a) is an important part of non-jury trial decision making. "The requirement that the district court make factual findings permits meaningful review on appeal because this [appellate] court may not engage in fact finding on its own." *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1275-76 (Fed. Cir. 1995). Further, when the Plaintiff puts the only evidence before the court as to damages, a defendant cannot decline to put on any evidence and then criticize the Court's findings.

Filing 117 at 4–5. For the reasons set out in the body, it is not clear to the Court how a requirement that the district court make factual findings to permit meaningful review compels a district court to accept find facts compels a district court to accept one side's unrebutted expert testimony. If Kimbrough is making some other argument based on Rule 52(a), it is too vague for the Court to discern, and the Court therefore rejects it as waived. *See RJT Invs. X v. Comm'r*, 491 F.3d 732, 738 n.9 (8th Cir. 2007) ("Other than citing the standard of review and noting that sham determinations are conclusions of law, they neither point to specific elements that are unsupported by the facts nor do they raise favorable legal precedent for the purpose of contesting the sufficiency of those facts. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (holding that undeveloped arguments are waived and collecting cases that have held the same).").

court following a bench trial to make sufficiently detailed findings to inform the appellate court of the basis of the decision and to permit intelligent appellate review," and that those findings may explain a district court's acceptance of only some of an expert's opinions (internal quotation marks and citations omitted)). The purposes of the rule do not include binding a district court hearing a bench trial to the opinion of an "unrebutted" expert.

It would also be inappropriate to bind a court hearing a bench trial to an expert opinion that the court finds unsatisfactory under Federal Rule of Evidence 702. As the Seventh Circuit Court of Appeals explained, the requirements for expert testimony under Rule 702 remain applicable in a bench trial:

> It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened. *See United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir.2005). That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006), disapproved on other grounds by *Matter of Anderson*, 917 F.3d 566 (7th Cir. 2019). Nor is an opposing party necessarily obligated to present contrary expert evidence for the factfinder—whether a jury or a trial judge—to reject an expert's testimony. That is because "[v]igorous cross-examination" is one of the "traditional and appropriate means of addressing shaky but admissible [expert] evidence." *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)), cert. denied sub nom. *3M Co. v. Amador*, 142 S. Ct. 2731 (2022); see also *Ratliff*, 150 F.3d at 954 (holding that a party did not need to rebut

18

an expert opinion on an ultimate issue because "the jury was free to accept or reject the expert testimony").

However, Kimbrough asks the Court to rely on the decision of the Fifth Circuit Court of Appeals in *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016 (5th Cir. 1985), which she asserts is "not unlike the instant case." Filing 117 at 5. Kimbrough asserts that the Fifth Circuit affirmed the district court's damages award, noting "that none of the plaintiff's evidence was rebutted by the defendant, which did not call a witness." Filing 117 at 5 (citing *Winbourne*, 758 F.2d at 1018). Indeed, Kimbrough reads *Winbourne* to teach that "when the Plaintiff puts the only evidence before the court as to damages, a defendant cannot decline to put on any evidence and then criticize the Court's findings." Filing 117 at 4–5. The Court concludes that this reading of *Winbourne* is wrong and that *Winbourne* is ultimately inapposite and irrelevant to the issues presented here.

In *Winbourne*, the United States complained that the damages awarded in a bench trial for the plaintiffs' loss of his spouse and two children in an airplane crash were excessive. 758 F.2d at 1017. Those damages consisted of $500,000 for the loss of love and affection of the plaintiff's wife; $210,610.24 for the economic loss due to his wife's death, consisting of both loss of her teacher's salary and her household services; $150,000 for the love and affection of his 8-year-old daughter; and $150,000 for the loss of his 4-year-old daughter. 758 F.2d at 1017–18. In affirming the award, the Fifth Circuit stated,

> This award was made by the trial judge in a careful and detailed opinion. The economic loss computations were based on the specific testimony of an economist. The evidence established the unusual nature of this plaintiff's damages in the loss of his family. From a very happy family man, vigorous in his life and work, he became not only a man crushed by sudden tragedy but one who remained lost and disturbed. None of this evidence was rebutted or questioned by the defendant. We cannot upset the district court's damage findings unless we hold them to be clearly erroneous. "Because the assessment of damages for grief and

19

emotional distress is so dependent on the facts and is so largely a matter of judgment, we are chary of substituting our views for those of the trial judge. He has seen the parties and heard the evidence; we have only read papers." *Caldarera v. Eastern Airlines, Inc*., 705 F.2d 778, 783 (5th Cir.1983).

*Winbourne*, 758 F.2d at 1018.

  *Winbourne* is not instructive, because in that case, the "economic loss" of the spouse's salary was "based on the specific testimony of an economist," but that economic loss was "not questioned by the United States." *Id.* No other expert testimony was even mentioned in *Winbourne*. Thus, there was no challenge to the district court's acceptance or rejection of expert evidence. The Court observes that in *Winbourne*, the amount of the award that the United States challenged was for "loss of love and affection" of the plaintiff's wife and daughters, which the Fifth Circuit also characterized as "damages for grief and emotional distress" from their loss. *Id.* As explained in more detail below, in a wrongful death action under Nebraska law "damages are not recoverable for mental suffering or anguish, bereavement, or solace." *Williams v. Monarch Transp., Inc*., 470 N.W.2d 751, 756 (Neb. 1991). Thus, the disputed damages in *Winbourne* are not and cannot be at issue in this case and the disputed awards in *Winbourne* were not based on expert opinions. Therefore, the Fifth Circuit's affirmance of the district court in *Winbourne* says absolutely nothing about a district court's authority to reject or accept an expert's testimony, unrebutted or otherwise, on any matter after a bench trial.

  For all these reasons, Mr. Frankenfeld's opinions are not binding on the Court.

  *2.  The Determination of Lost Financial Support*

  Having concluded that the Court is not bound by Mr. Frankenfeld's opinions, the Court turns to determination of Kimbrough's damages for loss of Shawn's financial support. The Court

begins with a summary of the parties' pertinent arguments, in which Mr. Frankenfeld's opinions figure prominently.

        a.   The Parties' Arguments on Lost Financial Support

In her trial brief, Kimbrough urges the Court to adopt Mr. Frankenfeld's assumption that Shawn's initial lost annual earning capacity is $207,737, the average of his last two full years of earnings based on his tax returns. Filing 105 at 3. Mr. Frankenfeld testified at trial that each year the annual earnings estimate was increased by 2.5%. Filing 110 at 117:19–118 at 3. Kimbrough urges the Court to accept Mr. Frankenfeld's determination that past lost financial support from the date of Shawn's death to the date of Mr. Frankenfeld's first report on November 30, 2022, would be $469,400. Filing 105 at 3–4. She also urges the Court to accept all of Mr. Frankenfeld's other estimates for fringe benefits (15% of annual earnings), lost household services ($9/hour for one-half hour per day, or $1,643 per year), and adjustments for income taxes and Shawn's personal consumption (8.7% of earnings and fringe benefits), resulting in lost future financial support to Shawn's retirement at age 65 of $4,947,333, or to his retirement at age 70 of $5,678,709. Filing 105 at 3–4. At the bench trial, on direct examination, Mr. Frankenfeld testified consistent with his report on these calculations. Filing 110 at 79:16–111:17.

Gorham takes a strongly different view. Gorham argues that simply averaging Shawn's 2018 and 2019 earnings, to arrive at a figure of $207,737.00, is not a reasonable factual basis for Mr. Frankenfeld's assumption about Shawn's initial annual earning capacity. Filing 113 at 10. Gorham argues this is so, because those two years are not reflective of Shawn's new profession or the remuneration that he received for his position at Hope Cooperative Care. Filing 113 at 10. Instead, Gorham argues, "The only competent evidence before this Court of Mr. Kimbrough's

earning capacity at the time of his death is that he was earning $1,000 per week, or $52,000 per year." Filing 113 at 11 (citing Filing 110 at 115:6–14). Gorham also argues that there was no evidence of Shawn's expectations of future earnings at Hope Cooperative nor any evidence that he intended to return to work at a multinational corporation like Wal-Mart or Tyson. Filing 113 at 11. Gorham also argues that no evidence was presented about any fringe benefits that Shawn would receive while employed by Hope Cooperative. Filing 113 at 11. He asserts that the appropriate value to use for initial lost earning capacity is $52,000 per year, and that anything else is mere speculation. Filing 113 at 12. Gorham also asserts that there is no evidence of savings or habits of saving for retirement. Filing 113 at 13. Likewise, Gorham asserts there is no authority supporting adding taxes back in after subtracting them as Mr. Frankenfeld did. Filing 113 at 13–14. Nevertheless, Gorham argues that using Mr. Frankenfeld's calculations, the maximum appropriate award for lost financial support is in the same proportion as the initial earning capacities of Gorham's figure to Mr. Frankenfeld's figure, that is $52,000/$207,737 = .2503 (25.03%), or $949,066[4] which is 25.03% of Mr. Frankenfeld's estimate of $3,791,713 as the Lump Sum Award (net of income taxes). Filing 113 at 15; *see* Exhibit 22, Table II, upper right chart, far right column, sixth row). Gorham argues that Mr. Frankenfed's Lump Sum Award tax adjustment as an add-back (Exhibit 22, Table II, upper right chart, far right column, seventh row) is improper. Filing 113 at 15.

In reply, Kimbrough argues that there is no expert testimony or other supporting evidence for Gorham's calculation of Shawn's initial earning capacity at $52,000. Filing 117 at 2.

---

[4] The actual amount Gorham calculates is $949,128.35, but that is not the result of using the "rounded" figure of 25.03% that he states. *See* Filing 113 at 15.

Kimbrough asserts that Shawn had received pay at that rate for only two months of work at Hope Cooperative at the time he died, and Kimbrough characterizes it as a "transitional pay arrangement" following a COVID-19 layoff. Filing 117 at 2–3. Indeed, she brands Gorham's argument as "illogical." Filing 117 at 3. She argues that Mr. Frankenfeld's evidence is unrebutted, undisputed, and competent, so that the appropriate award should adopt Mr. Frankenfeld's calculations. Filing 117 at 3. As to the calculations themselves, Kimbrough asserts that Shawn's plan was to work with Hope Cooperative as an entrepreneurial opportunity leading to ownership, with the goal of achieving the same kind of earnings he had in 2018 and 2019. Filing 117 at 6. Kimbrough argues that Shawn's income showed an "upwards . . . trajectory" as he got older, so that starting with the top of that trajectory at the time Shawn died, as Mr. Frankenfeld did, is appropriate. Filing 117 at 7. Kimbrough also argues that Mr. Frankenfeld reviewed David Campbell's declaration with its projections of Shawn's future earnings with Hope Cooperative, and Mr. Frankenfeld found those projections were "consistent" with his own. Filing 117 at 8. Kimbrough argues for accepting Mr. Frankenfeld's calculation of fringe benefits, consumption, taxes, and other determinations. Filing 117 at 9–11.

b.  Standards for Determination of Lost Financial Support

Under Nebraska law, "pecuniary" damages for lost support are not decedent's entire earning capacity during his or her life expectancy:

> Although the plaintiff may introduce evidence as to the earnings of the deceased, the plaintiff may not recover the value of the earnings lost. The instructions should clearly state that so far as earnings are concerned, the recovery must be limited to the value of the amount which the beneficiaries would have received from the earnings of the deceased.

*Darnell v. Panhandle Co-op. Ass'n*, 120 N.W.2d 278, 286 (Neb. 1963); see also *Westring v. Schwanke*, 177 N.W.2d 506, 508 (Neb. 1970) ("The recovery is limited to the value of the services or the amounts which the beneficiaries would have received from the earnings of the deceased." (quoting *Darnell*, 120 N.W.2d at 286). Thus, "[t]he [fact finder is] entitled to determine the earning capacity of the deceased, his life expectancy at the time of his death, the ages and expectancies of the next of kin, the monetary loss they sustained by the death of decedent, and the purchasing power of money, the interest it would earn, and its present value." *Kroeger v. Safranek*, 87 N.W.2d 221, 226 (Neb. 1957).

The Nebraska Supreme Court has also explained, "In cases arising under the Wrongful Death Act, if the next of kin are lineal kinsmen of the deceased, a presumption of pecuniary loss obtains from the relationship, alone, sufficient to sustain a verdict and judgment awarding substantial damages, without proof of actual loss." *Millman v. Cnty. of Butler*, 504 N.W.2d 820, 827 (Neb. 1993) (quoting *Mabe v. Gross*, 94 N.W.2d 12, 16–17 (Neb. 1959)). Where the next of kin is the decedent's child, then the law imposes a duty upon the decedent to support his or her child, and a trial court errs if it fails to award damages for the decedent's child. *Id.* Thus, "the trial court is required to take a perspective view of existing circumstances to determine the pecuniary loss sustained by the decedent's [child], and '[t]he money value of such pecuniary loss cannot ordinarily be determined in dollars and cents. It is peculiarly a [factual] question to be determined from all the circumstances and evidence available.'" *Id.* (quoting *Mabe*, 94 N.W.2d at 17); *accord Poppe v. Siefker*, 735 N.W.2d 784, 792 (Neb. 2007) ("One common thread runs throughout all wrongful death cases, namely, that damages in any wrongful death case are incapable of precise computation and are largely a matter for the jury.").

24

       c.  Mr. Frankenfeld's Determination of Lost Financial Support Is
           Flawed

The Court concludes that Mr. Frankenfeld's determination of lost financial support is

flawed because it starts from an assumption about Shawn's initial earning capacity that does not

fit the facts of the case. *See McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021)

(explaining that Rule 702's requirement that expert testimony must be useful to the factfinder in

deciding the ultimate issue of fact means that the expert's opinion must fit the facts of the case).

Shawn's earnings of record are the following:

| Year | Earnings | Source | Record |
|------|----------|--------|--------|
| 2015 | $99,087 | Wal-Mart | Exhibit 12 |
| 2016 | $151,119 | Wal-Mart and Pilgrim's Pride | Exhibit 13 |
| 2017 | $174,872 | Pilgrim's Pride | Exhibit 14 |
| 2018 | $240,460 | Pilgrim's Pride | Exhibit 15 |
| 2019 | $175,014 | Tyson Foods and Timber Automation | Exhibit 16 |
| 2020 | $61,980 | Timber Automation and Hope Coop. Care | Exhibit 17 |

The shaded rows are the ones Mr. Frankenfeld used to determine Shawn's initial earning capacity,

because they were the "two most recent returns [which] I think give the best measure of his

capacity to earn in—in the future." Filing 110 at 89:12–18. Somewhat more specifically,

Mr. Frankenfeld explained,

> He—he, like many people of his age, had a generally upward trajectory in—
> in his earnings; and so it's appropriate to look at—at earnings near the top of that
> trajectory. The fact is he made I think $240,000 in one year and less than that in the
> next year, but the average was $207,000, and that's what I used.

Filing 110 at 89:19–24. To be precise, Mr. Frankenfeld started with $207,737, as shown in Exhibit

22 (Table II, top left chart). On cross-examination, Mr. Frankenfeld agreed that he had taken the

income from 2018 and 2019, added them together, and divided by two to arrive at the $207,737 figure. Filing 110 at 114:11–14. He then added,

> I acknowledge that in Mr. Kimbrough's case, his earnings history was somewhat volatile. It didn't move upward in an absolutely straight line. In fact, he'd earned more two years prior to his death than he earned one year prior to his death, and that's the reason I—I took the average of the final two years because to use that highest number of $240,000 would in my opinion be inappropriate.

Filing 110 at 114:23–115:5.

The Court agrees with both Mr. Frankenfeld's characterization of Shawn's earning capacity as showing an "upward trajectory" and at the same time being "somewhat volatile." Indeed, it is Mr. Frankenfeld's correct observation that Shawn's earnings history "didn't move upward in an absolutely straight line" but was "somewhat volatile" that convinces the Court that the average of Shawn's last two full and highest earning years is not the appropriate starting point. A further reason is that Mr. Frankenfeld's starting point entirely ignores that Shawn was starting in a new endeavor at a much lower salary, so that it would take some time before he again attained the same earnings that he had in 2019 let alone the even higher earnings that he had in 2018. The Court accepts Kacey's testimony that at Hope Cooperative Care Shawn "was going to be involved on the business side, help with financing and things like that, and [that he] eventually wanted to become a—a partner in the company," and eventually an owner. Filing 110 at 47:22–48:1. Nevertheless, common sense and Shawn's earnings as he built his career tell us that Shawn would not attain comparable income for at least some time—perhaps years—into his new employment.[5]

---

[5] Kimbrough refers to David Campbell's declaration concerning Shawn's likely future earnings with Hope Cooperative Care three times in her closing argument brief to support her contention that Shawn's two years with highest earnings are more representative of his earning capacity. *See* Filing 117 at 7 ("Mr. Campbell made a declaration that forecasted Shawn's annual income [at Hope Cooperative Care] at $200,000, which was consistent with expert Frankenfeld's analysis." (citing Filing 110 at 90:1–91:9)), 8 ("[E]xpert Frankenfeld reviewed the

On the other hand, the Court also finds that the record evidence clearly shows an earning capacity higher than the $52,000 per year that Shawn was making in his first year with Hope Cooperative Care, based on his education, diligence, and past work experience. At the same time, the evidence demonstrates that starting with the average of Shawn's 2018 and 2019 earnings does not fit the facts of the case. *See McMahon*, 5 F.4th at 903. Because it does not fit, the Court rejects it. *See Am. Milling Co.*, 623 F.3d at 573–74 (explaining that the weight the court gives an expert opinion in a bench trial is solely in the discretion of the judge, and while the judge may not arbitrarily fail to consider such testimony the judge is not bound to accept that testimony); *Nomura Holding Am., Inc.*, 873 F.3d at 146 (explaining that in a bench trial, the judge is not required to adopt in full or reject entirely an expert's conclusions).

To account for the up-turns and down-turns in Shawn's earnings while he was alive and the likely generally upward trajectory of his earnings in the future as he progressed in his new career, the Court concludes that a reasonable starting point is the average of Shawn's earnings for all six years for which there is record evidence—not just his earnings for the two years with the highest earnings, as Kimbrough asserts, or the $52,000 per year he was earning with Hope

---

Declaration of Hope Cooperative's owner, David Campbell, whose projection of $200,000 in annual income for Shawn was consistent with Frankenfeld's numbers." (citing Filing 110 at 90:1-91:9)), 11 ("The unrebutted report presented by expert Frankenfeld, and the evidence he considered from the David Campbell declaration, and the testimony of Kacey, were all evidence that affirmed the accepted methodology employed by him."). The arguments based on Mr. Campbell's declaration are improper. First, the Court excluded from evidence Mr. Campbell's declaration, which was Exhibit 26. Filing 110 at 131:24–25. Second, Mr. Frankenfeld "actually did state he did not rely on this information in writing his report"; indeed, as the Court explained on the record, "He stated that very—stated that very clearly." Filing 110 at 131:21–24; *see also* Filing 110 at 91:5–9 (Mr. Frankenfeld testified, "I didn't rely on Mr. Campbell's declaration because I had developed my figures before I received that, but his declaration is consistent with my analysis. He spoke about the prospect of earning $200,000 and—and that is consistent with my analysis."). Because Mr. Frankenfeld did not rely on Mr. Campbell's declaration, that declaration cannot be considered even as inadmissible evidence on which an expert may rely because the declaration has no probative value in evaluating the expert's—Mr. Frankenfeld's—opinion and it is also more prejudicial than probative because it is entirely speculative. *See* Fed. R. Evid. 703.

Cooperative Care, as Gorham asserts. *See Millman*, 504 N.W.2d at 827 (explaining that the monetary value of pecuniary loss in a wrongful death case "is peculiarly a [factual] question to be determined from all the circumstances and evidence available" (internal quotation marks and citation omitted)). That initial earning capacity is $150,422:

| Year | Earnings |
|:---:|:---:|
| 2015 | $99,087 |
| 2016 | $151,119 |
| 2017 | $174,872 |
| 2018 | $240,460 |
| 2019 | $175,014 |
| 2020 | $61,980 |
| TOTAL | $902,532 |
| ÷ 6 | $150,422 |

Gorham does not quibble with Mr. Frankenfeld's calculation of a 2.5% increase in earnings each year thereafter, and neither does the Court. *See* Filing 110 at 117:23–118:3; *see also* Exhibit 22, Table II, lower chart, col. 7 (Earning Capacity).

              d.    Additional Factors Determine the Final Award for Lost Financial Support

"[T]he plaintiff may not recover the value of the earnings lost," however. *Darnell*, 120 N.W.2d at 286. Rather, "the recovery must be limited to the value of the amount which the beneficiaries received from the earnings of the deceased." *Id.* More specifically, "[t]he [fact finder is] entitled to determine the earning capacity of the deceased, his life expectancy at the time of his death, the ages and expectancies of the next of kin, the monetary loss they sustained by the death of decedent, and the purchasing power of money, the interest it would earn, and its present value." *Kroeger*, 87 N.W.2d at 226.

As to life expectancy, *id.* (recognizing life expectancy as a factor in the calculation), and specifically Shawn's work life expectancy, Mr. Frankenfeld computed recoveries based on both Shawn working until he was 64.6 years old, Filing 110 at 96:9–21; Exhibit 22, and Shawn working until he was 70 years old, Filing 110 at 97:15–19; Exhibit 23. The Court acknowledges that Kacey answered "yes" to counsel's questions about whether Shawn would have worked past age 65 or

into his 70s, if he was physically able. Filing 110 at 69:14–24. On the other hand, the record also reflects that Shawn suffered from some chronic health issues, including his sinus issues and hypothyroidism. Filing 110 at 73:7–75:18. There is no evidence that Shawn was devoted to a healthy lifestyle of eating and exercise or any other evidence that reasonably suggests to the Court that he would exceed the median work life expectancy. Therefore, the Court finds that 64.6 years is the appropriate work life expectancy. The Court found above that the life expectancy for both Kacey Kimbrough and E.K. substantially exceeds Shawn's worklife expectancy, whether that is calculated as 64.6 years or 70 years. Exhibit 27. *Kroger*, 87 N.W.2d at 226 (also considering the ages and expectancies of the next of kin).

As to the monetary loss Kacey and E.K. sustained by the death of Shawn, and the purchasing power of money, the interest it would earn, and its present value, *id.*, Mr. Frankenfeld took those into account in his calculations, in the form of a 30% annual reduction for income taxes and an 8.7% annual reduction for Shawn's personal consumption, *see* Exhibit 22 (Table II, top left chart), and reductions to present value, *see id.* (Table II, lower chart, col. 5). Gorham does not clearly dispute these annual percentage reductions and agrees that a 30% annual reduction for income taxes paid in the future is appropriate. *See* Filing 113 at 14. Gorham does assert that no evidence was presented about "fringe benefits." Filing 113 at 11. However, he later adopts Mr. Frankenfeld's calculations using a 15% annual reduction for fringe benefits by simply requesting an award reducing Mr. Frankenfeld's calculation of the Lump Sum Award—which included that reduction for fringe benefits—in the same proportion as Gorham's calculation of initial earning capacity bears to Mr. Frankenfeld's calculation of initial earning capacity. *See* Filing 113 at 15.

One fighting issue on the lost financial support award is Mr. Frankenfeld's "Lump Sum Award tax adjustment," adding back in a sum larger than the income tax reduction. *See* Exhibit 22 (Table II, top right chart, sixth row). Gorham contends that this add-back tax adjustment is improper. Filing 113 at 15. Kimbrough argues that Gorham fails to explain how this adjustment is improper and that Mr. Frankenfeld explained his reasons for the adjustment. Filing 117 at 11 (citing Filing 110 at 127:7–21).

As to this adjustment, Mr. Frankenfeld testified,

> I acknowledge, of course, that I'm not an attorney, but from the point of view of an economist, which is the only way I can answer, if you're going to assume that taxes must be applied, it ought to be done in a way that is consistent with economic reality; and economic reality is if a lump sum is awarded and invested at interest, that interest will throw off taxable income; and if you don't adjust for the fact that that taxable income from the lump sum, part of it goes to the government instead of to the plaintiff, then you're effectively undercompensating the plaintiff. The lump sum is not sufficient to sustain the losses.

> So my calculation—I'm—I'm attempting to incorporate taxes into the calculation in a way that is economically appropriate. . . .

Filing 110 at 127:11–24. The Court finds that Mr. Frankenfeld's reasons for this "Lump Sum Award tax adjustment" are persuasive and that Gorham has not cited any authority demonstrating that it is inappropriate.

Still, it is not clear from either Exhibit 22, Exhibit 23, or Mr. Frankfeld's testimony how he calculated this "Lump Sum Award tax adjustment." The only reference to a calculation of the adjustment in the testimony is an obscure one where counsel asked on redirect, "And whether or not we add in 1.7 for a tax adjustment, that's something that I think the Court will make a determination in; correct?" to which Mr. Frankenfeld responded, "Well, I—I—yes, I presume the Court would make that determination." Filing 110 at 130:3–7.

Although counsel referred to a factor of 1.7, the Court has not found that multiplying the "Lump Sum Award tax adjustment" number by 1.7 produces any number found anywhere else in Exhibit 22, nor has the court found that multiplying any other number found anywhere else in Exhibit 22 by 1.7 produces the "Lump Sum Award tax adjustment" number. On the other hand, starting with the assumption that the "Income Tax Adjustment" numbers shown in row 5 of the upper right chart in Exhibit 22 would bear some relationship to the "Lump Sum Award tax adjustment" numbers in row 6, the Court made the following discovery: In each instance in Exhibit 22 and Exhibit 23, the "Lump Sum Award tax adjustment" in each column is approximately 1.082 times the Income Tax Adjustment:

| | Exhibit 22 | | | Exhibit 23 | | |
|---|---|---|---|---|---|---|
| | Past | Future | Total | Past | Future | Total |
| Tax reduction | ($130,188) | ($1,371,010) | ($1,501,198) | ($130,188) | ($1,575,810) | ($1,705,997) |
| Tax adjustment | $140,820 | $1,484,200 | $1,625,020 | $140,820 | $1,703,613 | $1,844,433 |
| TA ÷ TR | 1.08166651 | 1.08255957 | 1.08248212 | 1.08166651 | 1.08110305 | 1.08114668 |

Therefore, the Court finds such an adjustment by the factor derived from Mr. Frankenfeld's report in Exhibit 22 (1.082) is proper.

   e.   The Award Is Properly Based on Proportional Adjustments of
        Mr. Frankenfeld's Determinations

Because the Court determined above that Mr. Frankenfeld's determination of Shawn's initial earning capacity was flawed, the Court will not use his ultimate calculations, but must use something else. This amount must be consistent with the requirements of *Kroeger*, 87 N.W.2d at 226, and all the circumstances and the evidence available as required by *Millman*, 504 N.W.2d at

827. Nevertheless, it cannot be determined with mathematical precision or certainty, so it is a matter for the factfinder, here the Court. *See Poppe*, 735 N.W.2d at 792 ("One common threat runs throughout all wrongful death cases, namely, that damages in any wrongful death case are incapable of precise computation and are largely a matter for the jury).

Gorham offers the following alternative calculation:

Looking back, then, to the "Total" column of row 6 [in Table II in Exhibit 22, top right chart], with a finding of "Lump Sum Award (net of income taxes)" of $3,791,713, Defendant suggests [the appropriate award] amount is effectively ¼ of the actual estimated economic loss to the Estate [by Mr. Frankenfeld]. Defendant arrives at this conclusion by dividing Mr. Kimbrough's actual lost annual wages of $52,000 by the amount estimated by Mr. Frankenfeld and used in the table, of $207,737. The quotient for this calculation ($52,000/$207,737) is .2503, or 25.03%. Multiplying 25.03% against the calculated total of $3,791,713 results in a product of $949,128.35.

Defendant finds that $949,128.35 would be, on a percentage basis (25%), the appropriate measure of economic loss to the Estate of Shawn Kimbrough, as shown by the evidence offered at trial, and primarily based on Mr. Kimbrough's actual known earnings at the time of his death of $52,000 per year. By reducing Mr. Frankenfeld's number using a percentage, the calculation suggested by Defendant otherwise applies all of the internal percentages Mr. Frankenfeld multiplied against the estimated annual loss of income, and then added together to derive a total.

Filing 113 at 15–16;[6] *see also* Filing 113 at 16 (adding that Mr. Frankenfeld's total of $3,791,713 "is four times too high for the reason the initial annual estimated los[t] wages of $207,737 is effectively four times Mr. Kimbrough's actual wages of $52,000 he was earning at the time of his death.").

Kimbrough's only response to Gorham's calculation is the following:

Likewise, there is no evidence put forward by Gorham that would allow the Court to compute its own number, based on a makeshift averaging of the Hope

---

[6] Again, Gorham's calculation of $949,128.35 as the product of $3,791,713 and 25.03% differs from the Court's calculation of $949,066 because of "rounding" of figures.

> Cooperative income with the earnings assumption used by expert Frankenfeld. The Court should not simply pick a number of its own when, as here, there has been unrebutted and reliable testimony from an expert.

Filing 117 at 9. The Court believes the reference to "averaging of the Hope Cooperative income with the earnings assumptions used by expert Frankenfeld" is a reference to Gorham's argument for a reduction of Mr. Frankfeld's calculations by the same proportion that Gorham's initial earning capacity figure of $52,000 bears to Mr. Frankenfeld's initial earning capacity figure of $207,737.

The Court agrees with Gorham that a proportional reduction of Mr. Frankenfeld's award would maintain all adjustments (up or down) in the percentages Mr. Frankenfeld calculated. Gorham's argument is also a waiver of any objections that he might have to the percentage tax deduction, the tax adjustment, and the other percentage deductions or adjustments that Mr. Frankenfeld made. Gorham has adopted those adjustments by arguing for a straight proportional reduction of Mr. Frankenfeld's estimate. However, the Court finds that the proper reduction is not to 25.03% of Mr. Frankenfeld's award, based on the proportion that Gorham's estimated initial earning capacity bears to Mr. Frankenfeld's estimated initial earning capacity (that is $52,000/$207,737 = .2503 (25.03%)). *See* Filing 113 at 5. Rather the proper reduction is the proportion the Court's estimated initial earning capacity of $150,422 bears to Mr. Frankenfeld's estimated initial earning capacity of $207,737. That proportion (rounded to the nearest hundredth of a percent) is 72.41% ($150,422/$207,737 = .72409826).

Applying this proportional reduction to Mr. Frankenfeld's calculations produces the following calculation of lost financial support:

|  | Past | Future | Total |
|---|---|---|---|
| Exhibit 22 | $469,400 | $4,947,333 | $5,416,732 |

| Reduction | 72.41% | 72.41% | 72.41% |
|---|---|---|---|
| Result | $339,893 | $3,582,364 | $3,922,256 |

As a check, simply adding the reduced past lost financial support to the reduced future lost financial support would result in an award only $1 larger, $3,922,257, where the difference is the result of various roundings. The $1 larger amount is the total amount for past and future lost financial support that the Court will award. This amount is consistent with the requirements of *Kroeger*, 87 N.W.2d at 226, and the Court's determination from all the circumstances and the evidence available as required by *Millman*, 504 N.W.2d at 827.

### D. Lost Society, Comfort, and Companionship

The last category of damages at issue in this wrongful death case is "loss of society, comfort, and companionship." See *Panec*, 864 N.W.2d at 225. The parties have remarkably little to say in their briefing concerning this category of damages. In her trial brief, Kimbrough argues that Shawn and Kacey were "happily married" and the natural parents of E.K., together forming "a close family whose life revolved around family, faith, and work." Filing 105 at 4. Because both Kacey and E.K. were deprived of Shawn's care, comfort, and companionship—in E.K.'s case, for the rest of her youth and for the entirety of Shawn's remaining life expectancy of 42.5 years— Kimbrough argues that this category of damages "exceeds $6,000,000." Filing 105 at 4. Gorham "takes no position on an appropriate amount to award in damages to the Estate of Shawn Thomas Kimbrough for the loss of the 'comfort or companionship' that Shawn Kimbrough provided to his wife and daughter. . . ." Filing 113 at 17. In reply—which hardly seems necessary given Gorham's response—Kimbrough argues, "The evidence further demonstrates that the value of services, comfort, and companionship provided by Shawn (and that has been lost by his death) is even greater than the financial loss." Filing 117 at 3.

35

The Nebraska Supreme Court has construed "pecuniary loss" in the context of loss of society, comfort, and companionship to mean "a loss which has a money value." *Williams*, 470 N.W.2d at 755 (quoting *Maloney v. Kaminski*, 368 N.W.2d 447, 458 (Neb. 1985)). More specifically,

> [W]e have recognized that in this context,
>
>> the word "pecuniary" is not to be construed in a strict sense, that it is difficult to determine its exact measure, and that the task of determining such must be left to the good judgment and ordinary common sense of the jurors. The law does not provide any positive, definite mathematical formula or legal rule by which a jury shall fix the amount of pecuniary loss; it must be determined upon a consideration of the circumstances of each case. [Citations omitted.] There is no requirement that there be evidence of the dollar value of companionship, counseling, or advice.
>
> *Maloney v. Kaminski*, 220 Neb. 55, 69, 368 N.W.2d 447, 458 (1985) (affirming verdict of approximately $59,000 to elderly widow for loss of her husband's society and companionship).

*Reiser*, 587 N.W.2d at 340.

Under Nebraska law on wrongful death claims, "damages are not recoverable for mental suffering or anguish, bereavement, or solace." *Williams*, 470 N.W.2d at 756; *Crewdson v. Burlington N. R. Co.*, 452 N.W.2d 270, 280 (Neb. 1990) (explaining that available damages for wrongful death do not include any "mental suffering or bereavement or as a solace on account of" the decedent's death (quoting *Ensor v. Compton*, 194 N.W. 458, 459 (Neb. 1923)); *see also Reiser*, 587 N.W.2d at 340 ("No recovery is allowed for mental suffering or bereavement or as solace on account of the death."). As the Nebraska Supreme Court explained,

> Speiser reminds us of the difference between compensation for mental anguish, bereavement, or solace and compensation for loss of society, comfort, and companionship:
>
>> When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue

36

> of compensating them for their harrowing experience resulting from the
> death of a loved one.... The fundamental question in this area of damages is
> what deleterious effect has the death, as such, had upon the claimants? In
> other areas of damage, we focus on more positive aspects of the injury such
> as what would the decedent, had he lived, have contributed in terms of
> support, assistance, training, comfort, consortium, etc.

(Emphasis in original.) 1 S. Speiser, *Recovery for Wrongful Death* § 3:52 at 327
(2d ed. 1975).

*Williams*, 470 N.W.2d at 756. What is relevant and admissible under the wrongful death statute is

evidence of the decedent's relationship with his or her next of kin, not evidence of the pain,

suffering, or anguish felt by the next of kin. *Id.* at 756–57. In short, such an award will not include

any damages for Kacey's or E.K.'s emotional distress from Shawn's death.

The Court is cognizant of the difference between Kacey and E.K.'s mental anguish and

bereavement and need for solace after Shawn's sudden loss—which the Court appreciates are

great, but beyond the Court's power to compensate with money damages under Nebraska wrongful

death law—and their loss of Shawn's society, comfort, and companionship—which the Court may

attempt to compensate with money damages. *See id.* at 756. The Court's review of the evidence at

the bench trial convinces the Court that as to both Kacey and E.K., had Shawn lived, he would

have contributed substantially to their support, assistance, training, comfort, and consortium. *Id.*

Shawn was clearly devoted to Kacey and E.K. and was clearly interested and involved in their

lives. The Court recognizes that the evidence also shows substantial periods when Shawn was

working away from the family home or working away from the family home some days of each

week. The Court also recognizes that he was doing so for the commendable reason of building his

career the better to support the family, so the Court gives that fact no particular weight in its

determination of this category of damages. The Court has reviewed the evidence and considered

37

carefully the circumstances of this case, in the absence of a positive, definite mathematical formula or legal rule by which to fix the amount of this category of loss. *Reiser*, 587 N.W.2d at 340. Applying the Court's best judgment and the ordinary common sense of a factfinder in Nebraska federal court, *see id.*, the Court finds an award of $6,000,000 requested by Kimbrough would be excessive; instead, the Court finds an award of $1,500,000 for lost society, comfort, and companionship is appropriate.

### E.  The Damages Award

The Court finds and shall enter a verdict for Kimbrough and against Gorham and defaulted defendant JPS, jointly and severally, for damages totaling $5,436,266.87. That award consists of an award of $14,009.87 for funeral expenses; $3,922,257 for lost financial support; and $1,500,000 for lost society, comfort, and companionship.

### F.  Apportionment

The final issue the Court must resolve is the proper apportionment of the award between the widow and the next of kin. In her trial brief, Kimbrough "requests that the Court distribute such damages between Kacey Kimbrough and E.K. in accordance with the evidence," but she does not suggest any specific apportionment. Filing 105 at 4. At the beginning of the bench trial, the Court noted the apportionment requirement under the Nebraska Wrongful Death Act and asked the parties whether they anticipated that the apportionment would be addressed in the bench trial or in a separate apportionment proceeding. Filing 110 at 7:20–8:4. Kimbrough's counsel responded,

> Your Honor, we anticipate it would be addressed in this proceeding only, and we will have testimony that goes to that. I think the ultimate decision as to what the apportionment would be, would be yours.
>
> * * *

> But—and I think, frankly, in the—common sense and—and—and precedent would mean the apportionment would be primarily to the mother with some to the minor child but that the ultimate decision would be yours obviously.

Filing 110 at 8:5–14 (Court's interjection omitted). Gorham's counsel did not respond to the Court's question in the bench trial. However, in his closing argument brief, Gorham acknowledges that the judgment should be apportioned between Kacey and E.K., but he "takes no position on how the judgment should be allocated." Filing 113 at 7–8.

As the Nebraska Supreme Court has explained,

> Section 30-810 provides that "[t]he avails [of a wrongful death verdict or judgment] shall be paid to and distributed among the widow or widower and next of kin in the proportion that the pecuniary loss suffered by each bears to the total pecuniary loss suffered by all such persons." This statute further requires that the court distribute any such proceeds "to the persons entitled thereto after a hearing thereon. . . ."

*In re Est. of Helms*, 923 N.W.2d 423, 426–27 (Neb. 2019) (but finding the apportionment statute had no application where the case was not a wrongful death action). Here, the loss to each proper recipient is substantial. However, where E.K. is not only a minor but still quite young, her mother Kacey necessarily bears the substantial burden of supporting E.K. financially—a burden that Kacey would otherwise have been able to share with Shawn—and E.K. is not thrown solely on her own resources. Nevertheless, as a lineal kinswoman, E.K. should be assured some part of the support—financial and otherwise—that she has lost and to which she would otherwise be entitled had her father lived, to the extent money can provide that support. See *Millman*, 504 N.W.2d at 827 ("[I]f the next of kin are lineal kinsmen of the deceased, a presumption of pecuniary loss obtains from the relationship, alone, sufficient to sustain a verdict and judgment awarding substantial damages, without proof of actual loss." (internal quotation marks and citation omitted)). Under these circumstances, the Court finds it appropriate to apportion the award as follows: 75%

of the award shall be apportioned to the widow, Kacey; and 25% shall be apportioned to the E.K, as the next of kin and minor child of Kacey and Shawn.

## III. CONCLUSION

This tragic case has no happy ending. However, the Court has used its best judgment to determine a fair and reasonable damages award as authorized by the Nebraska Wrongful Death Act, Neb. Rev. Stat. § 30-809 *et seq.*, based on the evidence presented. Accordingly,

IT IS ORDERED that

1.     The Court finds in favor of plaintiff Kacey Kimbrough as the personal representative of the Estate of Shawn Thomas Kimbrough and against defendant Christopher James Gorham and defaulted defendant Jennings Plant Services, LLC (JPS) on Kimbrough's claims.

2.     The Court awards Kacey Kimbrough as the personal representative of the Estate of Shawn Thomas Kimbrough the sum of $5,436,266.87, in damages against defendant Christopher James Gorham and defaulted defendant Jennings Plant Services, LLC (JPS), jointly and severally, such award consisting of:

a.     $14,009.87 for funeral expenses;

b.     $3,922,257 for lost financial support; and

c.     $1,500,000 for lost society, comfort, and companionship.

3.     The award of damages shall be apportioned between the widow, Kacey Kimbrough, and the minor child next of kin, E.K., as follow:

a.     75% or $4,077,200.15 to Kacey Kimbrough; and

b.     25% or $1,359,066.72 to E.K.

40

4.      Judgment shall enter accordingly.

Dated this 8th day of December, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge